IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PENNY LINK, et al.,** : | |
| : | |
| Plaintiffs, : | |
| vs. : | CIVIL NO. 05-6342 |
| : | |
| **TRINITY GLASS** : | |
| **INTERNATIONAL, INC., et al.,** : | |
| : | |
| Defendants. : | |

**RUFE, J.**                                                                                             **August 22, 2007**

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants' Motions for Summary Judgment, which ask the Court to dismiss the Plaintiffs' sexual-harassment and retaliation claims. After reviewing the Defendants' motions, the Plaintiffs' brief in opposition, and the Defendants' reply briefs, as well as the applicable law, the Court will deny Defendants' motion against Plaintiff Link, and grant in part and deny in part the Defendants' motion against Plaintiff Neupauer, for the reasons stated below.

**BACKGROUND**

**A. Facts**

This case arises out of a workplace dispute among the staff at the Trinity Glass door factory ("Trinity")[1] in Breinigsville, Pennsylvania. The Plaintiffs are two women who worked at the

---

[1] Because the parties have treated Defendants Trinity Glass and Feather River Door Company as a single entity for analytical purposes, the Court will refer to those two Defendants collectively as "Trinity."

Trinity door factory during 2004, when the events relevant to this case occurred.  Plaintiff Tina Neupauer worked on the production team, assembling doors on the factory floor.  Plaintiff Penny Link worked in the office as a Transportation Clerk, scheduling pick-ups and deliveries with carriers.  Because the facts as they relate to each Plaintiff are not meaningfully intertwined, the Court will set out their stories separately.  And because these are motions for summary judgment, the Court views the factual record in the light most favorable to the non-movants.[2]

1. Neupauer

Neupauer began working at Trinity on March 18, 2004, in the production department, where she assembled doorjams.  She later became a "glazer," which involves inserting glass into doors.  Her regularly scheduled shift was Monday through Friday, from 7:00 a.m. to 3:30 p.m.  Neupauer worked on a team of about 8 people, under a "Lead," who would supervise the team.  Robert Kline, the Production Supervisor, in turn, supervised the various Leads.

According to Neupauer's deposition testimony, Kline began making lewd sexual comments to her a few weeks after she began working, on about a weekly basis.  Neupauer recounted six of these comments at her deposition.  First, she describes an incident where a tick bite caused her underarm to swell up to the point where she had to leave work to seek medical attention.  When she told Kline that she was so swollen that she could not wear a bra, he said, "you don't need your bra, I'll hold your tits for you."[3]  Second, later on that same day, Kline approached Neupauer with his

---

[2] Elliot & Frantz, Inc. v. Ingersoll-Rand Co., 457 F.3d 312, 318 (3d Cir. 2006).

[3] Neupauer Dep. 81:23, July 25, 2006.

hands out, and said that he was coming "to hold your tits all day."[4] Third, Neupauer describes an incident where she bent over to get a Windex bottle, when Kline asked, "while you're down there could you do me some favors[?]"[5] Fourth, she descibes an incident when, while working with a screw gun, Kline suggested that she "should have something in my hand other than the screw gun."[6] Fifth, she testified that Kline made "comments about my ass. The way I keep my hands in my pocket with my hands touching my butt, he proceeded that he wished it was his hands. Little comments like that here and there."[7] Sixth, she testified that Kline said, "you can go wash my truck with your bikini on."[8] Although Neupauer testified that she found these comments offensive, she also stated that she did not complain to Kline, nor did she formally complain to a supervisor.

       A few months after Neupauer began working at Trinity, the company began requiring workers to work "mandatory overtime," which consisted of working from 3:30 p.m. to 5:30 p.m. Trinity would impose this requirement on an as-needed basis, and did so continuously during the month of September 2004. Neupauer admitted in her deposition that she often would not work her mandatory overtime, but was never disciplined by Kline or any other supervisor.

       On October 4, 2004, Trinity issued Neupauer her annual employee review. Although the review was mostly positive, it stated that her attendance was "poor."[9] It also stated that she was

---

[4] Id. 82:15.

[5] Id. 83:4.

[6] Id. 83:23.

[7] Id. 84:2.

[8] Id. 268:15.

[9] Defs.' Reply Br. in Support of the Mot. for Summ. J. as to Pl. Tina Neupauer, Ex. 1, at 3.

"advised about working over time. She must work over time or she will be disciplined."[10] One week later, on October 11, 2004, Kline pulled Neupauer aside in a conference room and verbally reprimanded her for failing to work overtime. He told her again that if she did not do overtime, that she would be disciplined. The next day, on October 12, 2004, Neupauer made a formal complaint to Jon Sharp, the Production Manager, that Kline had sexually harassed her. Sharp then initiated a formal investigation based on the complaint.

       Sharp first brought in Office Manager Julio Rios to meet with him and Neupauer. Neupauer explained to them that Kline had been making inappropriate comments to her since the beginning of her employment. Neupauer also told them that Plaintiff Penny Link could corroborate that Kline had a habit of making foul comments in the workplace. Although Neupauer and Link did not know each other well, a Trinity employee named Chris Masters (who is also Link's nephew) had told Neupauer about sexually charged remarks that Kline had made to Link in the workplace.

       Later that day, Sharp, Rios, and Division Manager Nick Chang met with eight employees, including Kline himself, as part of their investigation into Neupauer's complaint. On October 13, Trinity's General Counsel, Chong So, arrived at the Breinigsville facility to review the investigation and "discuss any disciplinary actions and further investigation that may be warranted."[11] Chong So stated that "[b]ased on our investigation, we concluded that Ms. Neupauer's allegations of sexual misconduct by Mr. Kline were inconclusive. Out of the eight witnesses provided by Ms. Neupauer, only one (Christopher Masters) stated that he had personally witnessed inappropriate sexual comments made by Mr. Kline to Ms. Neupauer. All others deny or do not have

---

[10] Id.

[11] Chong So Aff. ¶ 5.

any personal recollection of such behavior."[12]

On October 14, Trinity issued Neupauer a written reprimand for failing to work overtime. The reprimand, signed by Jon Sharp, stated that: "Employee stated that she requested to leave early but never received approval or disapproval. She then left without confirming whether it was granted or not."[13] Two weeks later, on October 28, Trinity suspended Neupauer, again for failing to work overtime. The disciplinary form, signed by Jon Sharp, stated that "Neupauer has been advised on several occasions that she must improve her attendance and must make arrangements to be able to work the mandatory overtime."[14] The disciplinary form did not describe the length of the suspension, or describe any of its other terms. Neupauer formally resigned from Trinity the next day.

2. Link

Penny Link began her employment at Trinity on November 3, 2003, as a Transportation Clerk. Link's duties included scheduling deliveries and pick-ups from carriers, preparing related paperwork, and taking care of product displays at the Home Depot stores, where Trinity sold its doors.

Unlike Neupauer, Link developed a personal friendship with Robert Kline. Link testified in her deposition that she did not mind Kline's dirty jokes.[15] When Trinity began

---

[12] Id. ¶ 8.

[13] Pls.' Mem. of Law in Opp'n to Defs.' Mots. for Summ. J. ("Pls.' Brief"), Ex. I.

[14] Id. Ex. J.

[15] Link Dep. 79:15, July 24, 2006.

investigating Neupauer's complaint against Kline, it noted Link's own workplace conduct. In the course of that investigation, co-worker Jennifer Locher told Trinity General Counsel Chong So that "Ms. Link often initiated sexual jokes and comments to Mr. Kline, and Mr. Kline similarly initiated sexual jokes and comments to Ms. Link."[16] Co-worker Sandra Roberts stated in her interview that she had "personally witnessed Mr. Kline and Ms. Link make sexual comments to each other. It is something they both do."[17]

There is also evidence that Link made sexual comments to others in the workplace. For example, during the investigation of Neupauer's complaint, Jon Sharp told Chong So that Link had made "inappropriate sexual comments to him such as 'why don't you come sit on my lap.'"[18] Co-worker Charlie Kim stated that Link had "made inappropriate sexual comments to him, including comments that he had 'a small Asian penis.'"[19] Co-worker Jennifer Locher stated that "when the UPS driver, Fernando, came to Trinity Glass to pick up and deliver packages, [Link] would flirt with him. When he placed his daily reports into her file drawers, Penny Link would say to him 'get out of my drawers' and laugh. In addition, one time when Fernando came to Trinity Glass wearing a pair of shorts, Penny Link reached down and rubbed the back of his legs."[20]

About a week after the investigation, on October 20, 2004, Trinity issued Link a written reprimand for sexual harassment. The disciplinary form read, "Employee made inappropriate

---

[16] Chong So Aff. ¶ 12.

[17] Id. ¶ 7.

[18] Id. ¶ 12.

[19] Id.

[20] Locher Aff. ¶ 12.

sexually related comments to another employee."[21]  The reprimand also states that she "must never again make inappropriate comments," and warns that if she "violates any of the above [conditions], she will be terminated immediately."[22]  Trinity also suspended Kline for 7 days without pay, for sexual harassment.[23]

**C.  Procedural Posture**

The Plaintiffs have now sued Trinity and Kline.  They have brought claims against Trinity for sexual harassment and retaliation under both Title VII[24] and the Pennsylvania Human Relations Act ("PHRA"),[25] and against Kline for aiding and abetting under the PHRA.  Neupauer claims that Kline's comments subjected her to a hostile and abusive work environment, for which Trinity Glass is liable.  Neupauer further claims that by disciplining her twice, Trinity Glass unlawfully retaliated against her for complaining about Kline's conduct.  Link also brings a retaliation claim.  She argues that Trinity disciplined her not for making sexual comments in the workplace, but for coming forward as a witness during the October 12 investigation.  The parties have conducted discovery, and Trinity has moved for summary judgment on all claims.

---

[21]  Pls.' Brief, Ex. K.

[22]  Id.

[23]  Id. Ex. L.

[24]  Civil Rights Act of 1964 §§ 701–718,  42 U.S.C. §§ 2000e to 2000e-17.

[25]  43 Pa. Cons. Stat. Ann. §§ 951–963.

**DISCUSSION**

**A. Summary-Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), the Court should grant summary judgment to the moving party if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[26] In making this determination, the Court "'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'"[27]

Although this standard of review is designed to give the non-movants the benefit of every doubt, they must still produce enough evidence to persuade a reasonable jury to find for them at trial. Specifically, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[28]

**B. Review of the Plaintiffs' Claims**

1. Neupauer's Sexual Harassment Claim Under Title VII against Trinity Glass

In Count One of her Complaint, Neupauer claims that Trinity is liable to her for sexual harassment, based on Kline's conduct.[29] Although Title VII's anti-discrimination provision

---

[26] Fed. R. Civ. P. 56(c).

[27] Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007) (internal citation omitted).

[28] Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[29] Count One also presses a claim for sexual harassment on behalf of Link. In their brief in opposition to the Defendants' Motions for Summary Judgment, however, Link has withdrawn this claim. See Pls.' Brief, at 18.

does not explicitly proscribe sexual harrassment arising out of a hostile work environment,[30] the Supreme Court has recognized such a cause of action ever since its decision in Meritor Savings Bank, FSB v. Vinson.[31]  Indeed, today under Title VII, "the cognizability of a discrimination claim founded upon a hostile work environment is well-established."[32]

Under Third Circuit law, in order to state a claim under Title VII for sexual harassment resulting from a hostile work environment, an employee must show that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable woman in that position; and (5) the existence of respondeat superior liability.[33]  Although Trinity concedes that Kline's remarks amount to intentional sex-based discrimination under the first prong of the test, Trinity argues that Neupauer has not adduced sufficient evidence to prove the other four prongs—that Kline's remarks were severe or pervasive; that Kline's remarks detrimentally affected Neupauer, and would have affected a reasonable woman in her position; and that Trinity can be held liable for Kline's remarks under respondeat superior.

First, Trinity argues that Kline's remarks, although crass and inappropriate, are not so severe or pervasive that they "alter the conditions of [the victim's] employment and create an

---

[30] Title VII's anti-discrimination provision provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).

[31] Meritor Savings Bank FSB v. Vinson,, 477 U.S. 57 (1986).

[32] Jensen v. Potter, 435 F.3d 444, 448 (3d Cir. 2006).

[33] Id. at 449; Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007).

abusive environment."[34] The Court disagrees. The Supreme Court has held that the question of whether a work environment is abusive is defined not by a bright-line rule, but by the totality of the circumstances.[35] The Court set forth such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[36]

Although Neupauer described only six of Kline's comments in detail, she also testified in her deposition that Kline made offensive comments on a "[r]egular basis, at least maybe once a week, once every two weeks."[37] Assuming that Neupauer's testimony is true and accurate, as the Court must, the Court concludes that Kline directed lewd and unwelcome comments to Neupauer dozens of times during her tenure at Trinity. The comments that she described are rude, frequent, and an affront to her dignity. The fact that Kline was in a position of supervisory power and responsibility adds to the severity of his conduct, because the humiliating atmosphere that he created had behind it the weight of authority. Based on this combination of circumstances, the Court concludes that a reasonable jury could find that Neupauer was subject to an abusive work environment.

Second, Trinity argues that Kline's comments did not detrimentally affect Neupauer, nor would they affect a reasonable woman in her position. Trinity argues that Neupauer states that

---

[34] Meritor Savings Bank, 477 U.S. at 67.

[35] Harris v. Forklift Sys., 510 U.S. 17, 22–23 (1993) (holding that determining whether a working environment is hostile or abusive is not a "mathematically precise test," and "can be determined only by looking at all the circumstances").

[36] Id. at 23.

[37] Neupauer Dep. 265:4.

she was merely offended by the comments, but that they did not actually harm her. As evidence, Trinity points to the fact that Neupauer never complained to Kline himself that his comments offended and upset her.[38]

The Court will not split hairs over this area of inquiry. Although it is clear that Title VII is not a general civility code for the American workplace,[39] it is a mandate for workplace equality. Kline's comments are objectively abusive, and it should be beyond obvious that most women would find them to be so. Although Neupauer may not have suffered anxiety, depression, or emotional trauma, "Title VII comes into play before the harassing conduct leads to a nervous breakdown."[40] Title VII prohibits "[a] discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being."[41] Therefore, Neupauer need not have testified that she was reduced to tears, or sought medical attention, to show that she was subjectively "detrimentally affected" by Kline's comments. It is ultimately for the jury to decide whether Neupauer perceived the comments as offensive but harmless, or rather as creating an abusive working atmosphere proscribed by Title VII.

Finally, Trinity argues that there is no basis for holding it liable for Kline's conduct under the doctrine of respondeat superior. The Court disagrees. Under the Supreme Court's decision in Burlington Industries, Inc. v. Ellerth,[42] "[a]n employer is subject to vicarious liability to

---

[38] Neupauer Dep. 88:14; 99:10; 103:7; also id. 111:15 ("[W]hen he ever said something to me like that I would ignore it or just keep on my way of working.").

[39] Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81 (1998).

[40] Harris, 510 U.S. at 22.

[41] Id.

[42] 524 U.S. 742 (1998).

a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."[43] In a case where the harassment resulted in "tangible employment action, such as discharge, demotion, or undesirable reassignment," strict liability attaches without any defense.[44] In a case such as this, however, where a supervisor's harassment did not result in a tangible employment action, the employer does have an affirmative defense. "The defense comprises two elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."[45]

Trinity argues that the evidence supports this affirmative defense without need for resolution by a jury. It argues that because it launched an investigation immediately after Neupauer complained, and because Kline stopped making offensive comments after the investigation, that it cannot be held vicariously liable for Kline's prior comments. Indeed, the Third Circuit recently reiterated that an employer can defeat vicarious liability by showing that when it knew or should have known of the harassment, it responded with prompt and adequate remedial action.[46] Neupauer correctly points out, however, that the question of whether Trinity acted promptly and adequately remains a genuine issue of fact for trial.

Jon Sharp testified in his deposition that in May of 2004, on his second day at Trinity,

---

[43] Id. at 765.

[44] Id.

[45] Id.

[46] Andreoli v. Gates, 482 F.3d 641, 644 (3d Cir. 2007).

he learned from Penny Link that Kline had made a lewd sexual comment to her. Specifically, Kline had put his driver's license on Link's desk, and then said "that's so you remember what I look like, because I'm going to go down on you for so long you're going to forget."[47] Sharp testified that upon learning about this remark, he "turned to Bob [Kline] and said Bob, you can't say that."[48] Sharp testified that he pulled Kline aside the next day and reiterated that "it's not appropriate, that it's a dangerous thing to do because it may lead to, you know, serious problems down the road."[49] He also told Kline, "[d]on't do it again."[50] Sharp did not document this warning in writing. According to Neupauer's testimony, Kline continued making lewd sexual remarks to Neupauer after May of 2004.

There is also testimony in the record that another employee, Jon Aviles, told Trinity's Breinigsville Office Manager Julio Rios that Kline "is only good in sexually harassing girls."[51] Aviles had seen Kline make sexual remarks to Hispanic female employees who did not understand English. He also testified that he had heard Kline talk about women behind their backs, saying things like he "would like to bend the girls over."[52] Aviles testified that after he suggested to Rios that Kline was a sexual harasser in the workplace, that Rios "looked at me and said 'For real?' And I said, 'Yeah. For real.'"[53] This conversation took place in either August or September 2004.

---

[47] Sharp Dep. 87:12, Aug. 9, 2006.

[48] Id. 88:5.

[49] Id. 88:12.

[50] Id. 88:17.

[51] Aviles Dep. 13:1.

[52] Id. 15:2.

[53] Id. 16:6.

Based on this evidence, the Court concludes that a rational jury could find that Trinity did not act promptly and adequately to stem Kline's pattern of harassment, notwithstanding the effectiveness of its response after Neupauer formally complained on October 12. Sharp was on notice that Kline was a sexual-harassment liability about five months before the October 12 investigation, and Rios was on notice one to two months prior to the investigation. Both Sharp and Rios are management-level employees at Trinity's Breinigsville facility, and thus their knowledge can be imputed to Trinity itself. The Third Circuit has "denied summary judgment in favor of an employer when there was evidence that the employee's supervisor knew about the harassment and did nothing for three months, despite other evidence that the alleged harasser's supervisor later took immediate action upon learning of the harassment."[54] Consistent with this approach established by the court of appeals, this Court will allow the jury to decide whether Trinity's October 12 response to Kline's conduct is sufficiently prompt and adequate, so as to preclude the attachment of vicarious liability under Title VII.

Therefore, the Court will deny Trinity's Motion for Summary Judgment with respect to Neupauer's sexual-harassment claim.

2. Neupauer's Retaliation Claim under Title VII

Under Title VII's anti-retaliation provision, an employer may not "discriminate against any of [its] employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or

---

[54] Andreoli, 482 F.3d at 644 (describing Bonenberger v. Plymouth Twp., 132 F.3d 20 (3d Cir. 1997)).

participated in any manner in an investigation, proceeding, or hearing under this subchapter."[55] Neupauer claims that after she complained on October 12, 2004, Trinity unlawfully retaliated against her by issuing her a written reprimand two days later, and then suspending her two weeks after that.

Under the law of the Third Circuit, to prove a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in a protected activity; (2) that the employer subsequently subjected her to an adverse employment action; and (3) that a causal link exists between the protected activity and the adverse action.[56] Trinity concedes that Neupauer's October 12 complaint was a Title VII-protected activity. Trinity argues, however, that there is no causal connection between the October 12 complaint and Neupauer's subsequent discipline.

As is typical, Neupauer seeks to prove her retaliation claim based on circumstantial evidence. Thus, the Court looks to the Supreme Court's framework from McDonnell Douglas Corp. v. Green.[57] Under that framework, Trinity must articulate a legitimate non-retaliatory reason for the adverse action.[58] Neupauer must then prove, by a preponderance of the evidence, that Trinity's proffered reasons are not legitimate, but rather a pretext to disguise a retaliatory practice.[59] Neupauer "may succeed in this either directly by persuading the [fact finder] that a discriminatory reason more likely motivated the employer[,] or indirectly by showing that the employer's proffered

---

[55] 42 U.S.C. § 2000e-3(a).

[56] Barber v. CSX Distrib. Servs., 68 F.3d 694, 701 (3d Cir. 1995).

[57] 411 U.S. 792 (1973).

[58] McKenna v. Pacific Rail Serv., 32 F.3d 820, 825 (3d Cir. 1994).

[59] Barber, 68 F.3d at 701.

explanation is unworthy of credence."[60]

Neupauer argues that the timing between her October 12 complaint and her subsequent discipline was close enough so that a jury could reasonably infer causation. Indeed, the Third Circuit has held that the causation element of a retaliation claim can be inferred when the timing between protected and adverse acts is "unusually suggestive."[61] However, looking at the record as a whole, the Court concludes that a rational jury could not reasonably find that Trinity's proffered motive for discipline was pretextual.

Neupauer points out that she was never disciplined until after making her complaint on October 12. But Trinity had already put Neupauer on notice that she would be disciplined if she did not begin working her mandatory overtime. Her annual performance review, dated October 4, stated that she would be disciplined if she did not begin working overtime. When Kline met with her on October 11, he told her in person that she was obligated to work the mandatory overtime, or she would face discipline. Therefore, Neupauer's suggestion that Trinity was retaliating against her by reprimanding her, and then suspending her two weeks later, rings hollow. Neupauer admitted in her deposition that despite the warning in her performance review, she did not complete her mandatory overtime on October 11 or October 12, as instructed.[62] Trinity then reprimanded her on October 14. After she again failed to fulfill her mandatory-overtime obligation on October 27,[63] Trinity suspended her the following day. In fact, when Trinity's counsel asked Neupauer, "during

---

[60] Smith v. Borough of Wilkinsburg, 147 F.3d 272, 278 (3d Cir. 1998).

[61] Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (internal quotation and citation omitted).

[62] Neupauer Dep. 58–59.

[63] Szabo Aff. ¶ 6.

the month of October [2004] you didn't work most of the mandatory overtime days, correct?," Neupauer responded, "Yes."[64]

Therefore, the Court concludes that as a matter of law, Neupauer cannot establish the causal connection necessary to prove that she was retaliated against. Trinity warned her twice that it would discipline her for further absences. Trinity then gave Neupauer a written reprimand, followed by a suspension. Thus, Trinity's position that it disciplined Neupauer for a legitimate non-retaliatory reason is highly plausible, while Neupauer's position that it was a mere pretext for retaliation is not at all persuasive. The Court concludes that a rational jury could not reasonably find that Trinity retaliated against Neupauer for making a formal complaint against Kline, and therefore will grant Trinity's motion on Neupauer's retaliation claim.

3. Link's Retaliation Claim under Title VII

Link has also brought a retaliation claim based on her participation as a witness in the October 12 investigation. She claims that by giving her a written reprimand on October 20 for sexual harassment, Trinity retaliated against her for participating in the investigation.

There is no dispute that by participating in the investigation as a witness, Link engaged in an activity protected under Title VII.[65] The Court is also satisfied that in light of the Supreme Court's decision in Burlington Northern & Santa Fe Railway v. White,[66] Link's written

---

[64] Neupauer Dep. 70:10–14.

[65] Title VII's anti-retaliation provision prohibits retaliation against participation in a workplace investigation. See 42 U.S.C. § 2000e-3(a) (employer may not "discriminate against any of [its] employees . . . because [s]he has . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter").

[66] 126 S. Ct. 2405 (2006).

-17-

reprimand is an adverse employment action. Under Burlington Northern, any employer act that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination" is an adverse act for Title VII purposes.[67] Link's written reprimand states that she "must never again make inappropriate comments," and warns that if she "violates any of the above [conditions], she will be terminated immediately."[68] The Court concludes that such a warning could create a chilling effect such that a reasonable worker wishing to file a complaint against her employer might be dissuaded from doing so.

Finally, although a close call, the Court finds that there is sufficient doubt about Trinity's motive for disciplining Link, such that a jury could reasonably infer a causal connection between Link's participation as a witness and her subsequent written reprimand. While Trinity has advanced a legitimate reason for disciplining Link—her own sexually charged comments in the workplace—the Court finds that the eight-day lapse between her participation and her discipline is sufficiently suggestive to call that legitimate reason into question,[69] particularly in light of the five-month delay between Link's alleged sexual comments and her reprimand. Therefore, the Court will permit Link to present her retaliation claim to the jury.

4. Plaintiffs' Sexual-Harassment and Retaliation Claims under the PHRA

In their briefs, the parties do not discuss the Plaintiffs' claims under the PHRA. The Court notes, however, that in this Circuit, the PHRA is to be interpreted in an identical manner to

---

[67] Id. at 2415.

[68] Pls.' Brief, Ex. K.

[69] See Jalil v. Avdel Corp., 873 F.2d 701, 709 (3d Cir. 1989) (timing of adverse employment act may suggest retaliatory motives on part of employer).

federal employment-discrimination laws.[70] Therefore, Neupauer's sexual-harassment claim under the PHRA will survive summary judgment, just as her identical Title VII claim will. Similarly, Link's PHRA claim for retaliation will survive summary judgment. Neupauer's PHRA claims for retaliation, however, will not survive summary judgment.

5. Plaintiffs' Aiding-and-Abetting Claim under the PHRA

Plaintiffs also bring a PHRA claim against Kline as an individual for "aiding and abetting."[71] The Plaintiffs, however, do not address this claim in their brief. Therefore, without any guidance as to the relevant facts and law that support this claim for relief, the Court cannot determine whether the claim is fit for resolution by the jury. Therefore, the Court will enter summary judgment for Trinity on this claim.

**CONCLUSION**

Based on the foregoing analysis, the Court will permit Neupauer to try her sexual-harassment claims, and Link to try her retaliation claims, before the jury. All other claims will be dismissed.

An appropriate Order follows.

---

[70] Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002).

[71] Under 43 P.S. § 955(e), "It shall be an unlawful discriminatory practice . . . [f]or any . . . employer . . . to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice."

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PENNY LINK, et al.,** :<br>:<br>Plaintiffs, :<br>vs. :<br>:<br>**TRINITY GLASS** :<br>**INTERNATIONAL, INC., et al.,** :<br>:<br>Defendants. :<br>: | **CIVIL NO. 05-6342** |

## ORDER

**AND NOW**, this 22nd day of August 2007, upon consideration of Defendants' Motions for Summary Judgment [Doc. ## 27, 28], Plaintiffs' Response in Opposition [Doc. # 34], Defendants' Reply Briefs [Doc. ## 45, 46], and the applicable law, it is hereby

**ORDERED**, that Plaintiff Penny Link's claims for sexual harassment under Title VII and the PHRA are **DISMISSED AS WITHDRAWN**; it is further

**ORDERED**, that Defendants' Motion for Summary Judgment Against Plaintiff Penny Link [Doc. # 27] is **DENIED**; it is further

**ORDERED**, that Defendants' Motion for Summary Judgment Against Plaintiff Tina Neupauer [Doc. # 28] is **GRANTED IN PART** and **DENIED IN PART**; it is further

**ORDERED**, that Plaintiff Neupauer's claims for retaliation under Title VII and the PHRA, and her claim for aiding and abetting under the PHRA, are **DISMISSED WITH PREJUDICE**. All other claims remain. The Court will set the matter for trial at a future date.

BY THE COURT:

/s/ Cynthia M. Rufe
_____
**CYNTHIA M. RUFE, J.**